UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No.: 1-07-CR-19-TS |
| | ) | |
| DEMETRIUS LAMONT MOORE | ) | |

**OPINION & ORDER**

This matter is before the Court on the Defendant's Motion to Suppress (DE 19). The Defendant has moved to suppress "any and all evidence seized when one or more Fort Wayne Police Department Officers and/or officers assigned to other agencies search[ed] the car Moore was driving on or about February 6, 2007, in Allen County." (Mot. to Suppress 1, DE 19.) Suppression is required, the Defendant believes, because the vehicle was searched without a valid warrant and without a valid exception to the warrant requirement. The government agrees that there is no warrant in this case, but it argues that several exceptions to the warrant requirement apply and that the evidence was properly seized. The Court agrees with the government, and for the reasons stated in this opinion, the Court DENIES the Defendant's Motion to Suppress (DE 19).

**BACKGROUND**

On February 28, 2007, the grand jury returned an indictment against the Defendant charging him in count one with possessing, with the intent to distribute, between five and fifty grams of crack cocaine, and in count two with possessing an unspecified amount of marijuana. (Indictment 1–2, DE 1.) The indictment charges that this conduct occurred on or about February 6, 2007. (*Id.*) The Defendant appeared before Magistrate Judge Roger B. Cosbey on March 5,

2007, and pled not guilty to both counts.

The Defendant filed the motion to suppress that is now before the Court on June 25, 2007 (DE 19). In the motion the Defendant states that on February 6 he complied with all traffic laws, and he claims that the police stopped his car without any probable cause. As such, the Defendant believes that any evidence obtained from the resulting arrest and search must be suppressed as the fruit of an illegal seizure.

The government responded to the motion to suppress on June 27, 2007 (DE 20). In its response, the government asserts that the police stopped the Defendant's car because he was traveling on Interstate 469 at 85 miles per hour, which is well in excess of the speed limit. The government further alleges that when the police approached the vehicle, they detected a strong odor of marijuana emanating from the vehicle. Finally, the government claims that the police ran a computer check of the Defendant's name and date of birth and learned that he was driving on a suspended license. The government therefore believes that the traffic stop and subsequent arrest and searches were all supported by probable cause.

On August 17, 2007, the Court conducted an evidentiary hearing on the motion. The Defendant was present at the hearing with his attorney, Thomas N. O'Malley. The government was represented by Assistant United States Attorney Anthony W. Geller. The Court heard testimony from Detective Darrick Engelman, Detective Teresa Smith, and the Defendant. The Court also admitted into evidence a copy of the speeding ticket issued to the Defendant on the night in question, a map of Fort Wayne, and a videotape of the traffic stop. The Court has considered all the testimony and exhibits in rendering its decision.

Following the hearing, the Defendant filed a brief in support of the motion to suppress on

November 5, 2007 (DE 29). The government responded on December 5, 2007 (DE 30), and the Defendant replied on January 11, 2008 (DE 33). The only issue in dispute is whether the police had probable cause to stop the Defendant's vehicle on February 6, 2007.

**FINDINGS OF FACT**

On February 6, 2007, around noon, Detective Teresa Smith, a detective in the Vice and Narcotics Division of the Fort Wayne Police Department, conducted surveillance for approximately ten minutes on a suspected drug house at 8929 Brockport Run in Fort Wayne, Indiana,[1] from her unmarked black Chevrolet Cobalt approximately three to four houses down the street. As she was monitoring the house, she saw the Defendant exit and get into the driver's seat of a gold Oldsmobile Alera displaying dealer plates.[2]

The detective waited until the Defendant drove away from the suspected drug house and turned north onto Chiswell Run before she began following him.[3] The Defendant then turned east onto St. Joe Center Road. While following the Defendant on St. Joe Center Road, the traffic delayed Detective Smith and she lost sight of the Defendant after he crossed Wheelock Road. She continued on St. Joe Center Road until she reached Maysville Road, at which point she

---

[1] This suspicion was based on two tips, a 911 phone call, and the fact that the residence was occupied by a known narcotics offender. The first tip was from a Fort Wayne police officer familiar with the area who advised the detective that he had observed significant vehicle traffic to the residence and that the visitors were only staying for a short period of time, which is consistent with the operation of a drug house. The second tip was from an anonymous neighbor reporting the same. The 911 call was placed in October 2006 by the children at the residence who stated that "Mommy sells drugs, Mommy keeps the drugs in the basement." (Tr. 75.)

[2] The car was outside the house before the detective arrived, so she does not know how long the Defendant had been at the house.

[3] The detective decided to follow the Defendant with the hope that he would either lead the detective to more evidence of criminal activity, or he would create some probable cause for the police to conduct a traffic stop.

turned south.[4] While traveling down Maysville Road, the detective saw the Defendant turn onto Interstate 469, but by the time she saw him it was too late for her to get on the interstate. She then turned around and got on Interstate 469 herself.

Once Detective Smith got on the interstate, she had to drive approximately 90 miles per hour to catch up with the Defendant. When she caught up with the Defendant, she paced his car[5] at 85 miles per hour. She advised Detective Engelman, a uniformed detective in the Vice and Narcotics Division of the Fort Wayne Police Department who was following shortly behind, of the Defendant's speed and instructed him to initiate a traffic stop.[6]

Detective Engelman quickly drove up behind Detective Smith's car. Detective Smith then pulled away and Detective Engelman began following the Defendant at approximately the intersection of Interstate 469 and Moeller Road. While Detective Engelman was following the Defendant, he used his moving radar[7] to clock the Defendant at 85 miles per hour, and he also observed that his speedometer read approximately 85 miles per hour while he was following the Defendant. The weather was cold and snowy and there was dry snow blowing across the road,

---

[4] There was some contradictory testimony on this point. Detective Smith testified that after she lost the Defendant, she continued on St. Joe Center Road and then turned south on Maysville Road. (Tr. 57.) She also testified that Detective Brian Martin turned south onto Meijer Drive attempting to locate the Defendant. (*Id.*) Meijer Drive intersects with St. Joe Center Road prior to the intersection of St. Joe Center Road and Maysville Road, and Meijer Drive itself intersects with Maysville Road at another point, forming a triangle between the three roads. (Def. Ex. A.) Detective Engelman testified that Detective Smith turned down Meijer Drive. (Tr. 24.) However, Detective Engelman seemed confused about the roads in this area. He explained, "I'm just [not] real good with the roads out north because I worked out south my whole career . . . ." (Tr. 24.) He also may have been confused about which detective turned down which road. Given Detective Engelman's confusion, the Court credits Detective Smith's testimony in establishing the precise route that she drove in pursuing the Defendant.

[5] The detective "paced" the car by maintaining a distance of approximately one or two car lengths behind the Defendant for a couple of minutes while maintaining the same speed as him.

[6] Detective Engelman was accompanied in the car by Detective Gigli, who was not called to testify at the evidentiary hearing.

[7] The radar had been calibrated the previous evening and it was functioning correctly.

although it was not slick and there was no accumulation. Believing that the speed limit at that point on the interstate was 65 miles per hour, Detective Engelman activated his lights and sirens to initiate a traffic stop at approximately the intersection of Interstate 469 and Minnich Road. The distance between the exit where the Defendant drove onto Interstate 469 and the point at which he was stopped was more than 5 miles.

    The Defendant, the only occupant of the vehicle, pulled over once Detective Engelman activated his lights and sirens. As Detective Engelman approached on the driver's side and Detective Gigli approached on the passenger side, Detective Engelman observed the Defendant reaching around inside the vehicle. At least some of the movement that Detective Engelman observed was the Defendant searching for his identification. Detective Engelman asked the Defendant for his driver's license and vehicle registration, and the Defendant responded that he did not have any. The Defendant advised that he had just left his aunt's house.[8] Detective Engelman observed a haze of smoke and detected a strong odor of marijuana coming from inside the car.

    After Detective Engelman smelled the marijuana odor, he and his partner realized that they had prior dealings with the Defendant. Detective Engelman knew that the Defendant was labeled in the police computer system as "Code X," which meant that the Defendant was a "known resister," and he had been involved in other investigations involving the Defendant (Tr. 14–15.) Detective Gigli had recently been involved with the Defendant resisting arrest.

    At this point the Defendant was removed from the car, handcuffed, and placed in the rear

---

[8] The Defendant claims that he told Detective Engelman that he had just left a friend's house. (Tr. 92.) Kelly Hartman is not the Defendant's aunt. For reasons the Court explains *infra*, the Court credits Detective Engelman's testimony with regard to precisely how the events surrounding the traffic stop unfolded.

seat of the squad car. One of the officers then ran a driver's license check through the Bureau of Motor Vehicles, which indicated that the Defendant's driver's license was suspended for a prior misdemeanor. The vehicle was towed and inventoried pursuant to a Fort Wayne Police Department policy. The inventory search uncovered a bag of marijuana containing 5.8 grams. The Defendant was transported to the police station. While he was at the police station, he was searched by Detectives Engelman and Gigli, and they found two bags of marijuana, totaling 46.4 grams, and a bag of crack cocaine, totaling 17.1 grams, on his person.

The Defendant claims that he was at 8929 Brockport Run on February 6 in order to use his friend Kelly Hartman's exercise equipment.[9] He testified that he left the house at 11:00 a.m. and quickly became concerned that a "narc car," or an undercover car, was following him. When he exited onto Interstate 469 he put his cruise control on 70 miles per hour because he believed the police were following him. Nonetheless, the police pulled him over in the vicinity of Interstate 469 and Minnich Road, and the Defendant claims that when Detective Engelman approached the car he told the Defendant, "don't try none of that bull 'S' that you be doin'." (Tr. 86.) Detective Engelman, according to the Defendant, also said, "hey, Demetrius, what you doin' on this side of town?" The Defendant testified that the officers did not say much else before they arrested him. He also claims he did not violate any traffic laws and that the officers never asked him for his license and registration.

Because the police had probable cause for the traffic stop and subsequent arrest, what exactly Detective Engelman said to the Defendant as he approached the car and how long it took him to recognize the Defendant is irrelevant. The Court finds that the Defendant was in fact

---

[9] The Defendant's actual purpose for being at the residence is irrelevant to what reasonable suspicions the surveilling officers harbored, so the Court need not determine the credibility of this claim.

speeding. Detective Engelman's testimony to this effect was corroborated and credible. The Defendant, facing the obvious incentives to shade the truth, presented less credible and uncorroborated testimony.

Pertaining to the issue of credibility, the Defendant testified to his prior felony convictions. The Defendant was convicted on December 7, 1998, of reckless homicide, a felony, under Cause Number 9809-DF-294 in Allen Superior Court, Fort Wayne, Indiana. He was convicted of two felonies on February 6, 2006, in the Allen Superior Court, for possession of cocaine under Cause Number 0509-FD-620, and for resisting law enforcement under Cause Number 0510-FD-690. He was also convicted for resisting law enforcement by means of a vehicle, a felony, under Cause Number 02D040611-FD-944, on May 22, 2007.

## CONCLUSIONS OF LAW

The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is a first principle of Fourth Amendment jurisprudence that the police may not conduct a search unless they first convince a neutral magistrate that there is probable cause to do so." *New York v. Belton*, 453 U.S. 454, 457 (1981). However, there are exceptions to this general warrant requirement. One of the most significant exceptions, if not the most significant exception, is the so-called "automobile exception."

When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "As a general matter, the decision to stop an automobile is reasonable

where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810; *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000). In Indiana, speeding is a traffic violation. Ind. Code § 9-21-5-13. Any ulterior motive an officer may have for making the stop is irrelevant. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813).

A traffic stop is similar to an investigative detention and is thus governed by the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Finke*, 85 F.3d 1275, 1278 (7th Cir. 1996). A police officer is justified in conducting a brief investigative stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Although reasonable suspicion requires more than a mere "hunch," it is a measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In assessing the reasonableness of a *Terry* stop, the facts are "judged against an objective standard: would the facts available to the officer at the moment of seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry*, 392 U.S. 21–22).

Once a police officer has initiated a traffic stop, if he has probable cause to believe that the automobile contains contraband, he may search the automobile and seize any contraband without first obtaining a warrant. *Carroll v. United States*, 267 U.S. 132 (1925); *United States v. Hines*, 449 F.3d 808, 814 (7th Cir. 2006). "Determining whether probable cause exists involves a practical, common-sense decision whether, given all the circumstances set forth there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

8

(brackets, ellipsis, and quotation marks omitted). The smell of marijuana constitutes probable cause to search a vehicle. *See United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006) (cataloguing cases holding that smell of marijuana constitutes probable cause for search). The search may extend "to the entire area in which the object of the search may be found." *United States v. Ross*, 456 U.S. 798, 820 (1982).

Another exception to the warrant requirement is the "search incident to arrest" doctrine. "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 762–63 (1969). It is also reasonable for the officer to search the arrestee in order to prevent the concealment or destruction of evidence. *Id.* at 763. "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Belton*, 453 U.S. at 460. The police "may also examine the contents of any containers found within the passenger compartment." *Id.* Indiana proscribes driving with a suspended license. Ind. Code § 9-24-19-2.

The final relevant exception to the warrant requirement is for "inventory searches." Police may "search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect," and "the absence of a warrant is immaterial to the reasonableness of the search." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). Standardized criteria or an established routine "must regulate the opening of containers found during inventory searches." *Florida v. Wells*, 495 U.S. 1, 4 (1990). The same rules apply to inventory searches of automobiles. "Searches conducted by

9

the police prior to towing a car are lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property – and protecting the police from the owner's charging them with having stolen, lost, or damaged his property." *Cherry*, 436 F.3d at 773 (quotation marks omitted).

The parties do not dispute the applicable law or that if Detectives Engelman and Smith observed the Defendant speeding, as they testified that they did, the stop was reasonable under the Fourth Amendment. The Defendant correctly summarizes as follows:

> If Moore was in fact doing 85 in a 65 (or 70) mile per hour zone then clearly Detective Engelman had probable cause to believe that a traffic violation had occurred. Therefore, stopping Moore, under those circumstances, was well within the parameters set by the Seventh Circuit in [*United States v.*] *Lawuary*[, 211 F.3d 372, 375 (7th Cir. 2000)]. Moore admits that he did not have a valid driver's license. Therefore Moore concedes without further argument that the police could not allow him to continue to drive the car and the car was taken into policy custody just as anticipated by *United States v. Jenson*, 169 F.3d [1044, 1048 (7th Cir. 1999)]. At this point, by way of the inventory search, the marijuana would have been discovered and Moore would have been arrested. Once Moore was arrested, a search incident to his arrest would have been conducted and the crack cocaine would have been discovered.

(Def. Br. in Supp. of Mot. to Suppress 6, DE 29).

The only issue, then, that has been presented for this Court's resolution is whether Detective Engelman's testimony is credible. (*Id.*) ("Moore's case comes down to a question of credibility.") The Defendant presents two factual disputes, one more general, and one more specific. The general factual dispute is whether the Defendant was speeding on Interstate 469, thus creating probable cause for a traffic stop. The more specific question is whether the Defendant was driving 85 miles per hour down Interstate 469.

The Defendant claims that his cruise control was set for 70 miles per hour as he drove

10

down the interstate.[10] The Defendant does not present any evidence suggesting that if he did set his cruise control at 70 miles per hour his car might have been traveling slower than 70 miles per hour nonetheless. Accepting the Defendant's claim *arguendo*, whether he was speeding, then, depends on what the speed limit was. The Defendant believes the speed limit was 70 miles per hour, but he provides no basis for this belief. Detective Engelman believes the speed limit on the relevant portion of Interstate 469 was 65 miles per hour. (Tr. 11; Gov. Ex. 1.)

Detective Engelman's testimony and the Defendant's testimony as to the applicable speed limit conflict. The Court, having listened to the testimony of both witness and having observed them make their statements, finds Detective Engelman's testimony more credible. The Defendant has acknowledged that his entire argument for suppression rests on whether or not he was speeding. Having claimed that he set his cruise control at 70 miles per hour, he has every incentive to state that the speed limit is 70 miles per hour instead of 65 miles per hour regardless of whether or not that is the case.

Detective Engelman, however, has every incentive to be truthful in his claim that the speed limit is 70 miles per hour. If the detective were to misrepresent the speed limit on traffic tickets, defendants could easily establish that the speed limit was different than the speed stated by the detective, subjecting him to embarrassment as well as likely undesirable employment consequences. Since the detective reported that the Defendant's speed was 85 miles per hour, it

---

[10]  "Q.   And when you 'hit the highway,' as you say, what speed did you put [the cruise control] on?
   A.   75 – I mean, 70 exactly because the speed limit was 70. I put it on 70." (Tr. 86.)

11

matters little to him whether the speed limit was 65 miles per hour or 70 miles per hour.[11] From his perspective, the Defendant was speeding either way.

Detective Engelman did have a little difficulty recalling during his testimony whether the applicable speed limit was 55 or 65 miles per hour (he never indicated that it might be 70 miles per hour), and his recollection had to be refreshed, but there was no evidence suggesting that he was confused at the time he issued the citation. (Tr. 10.) Even if the applicable speed limit was 70 miles per hour, the Court finds that the Defendant was traveling 85 miles per hour when Detectives Smith and Engelman were following him on Interstate 469, and the Defendant was therefore still speeding in violation of Ind. Code § 9-21-5-13 . The testimony of the detectives was credible and consistent with one another's. The Defendant has every incentive to claim that he was not speeding even though he was, and his prior felony convictions undermine his credibility when it is compared with that of the two detectives.

The Defendant claims that his credibility is superior to that of the two detectives. His first argument in support of this claim is that it would not have made any sense for him to be speeding down the interstate as an unlicensed driver after leaving a drug house when he suspected that he was being followed by the police and was carrying marijuana and crack cocaine. The flawed premise of this argument is that it requires the Court to assume that the Defendant had to have been acting rationally. The argument is also problematic in that it requires the Court to assume that it is a great deal more rational to leave a drug house possessing crack and marijuana and drive down the interstate without a valid driver's license, but while obeying the traffic laws (save

---

[11] Detective Engelman testified that a reckless driving violation does not occur until the driver is 31 miles per hour over the speed limit. (Tr. 46.)

for the one that says it is necessary to have a valid driver's license to operate a motor vehicle on the public roads, Ind. Code § 9-24-1-1).

Another problem with the Defendant's argument is that it is always irrational to commit traffic violations while drugs are in the car, yet this happens all the time. The reporters are filled with such cases. Courts of course do not discount the testimony of the arresting officers in all these cases simply because it was unwise for the defendants to commit traffic infractions. In fact, the Defendant's actions, as alleged by the government, are not uncommon at all. *See, e.g.*, *Whren v. United States*, 517 U.S. 806 (1996) (upholding search of vehicle that had been traveling at an "unreasonable" speed despite containing "several types of illegal drugs"); *United States v. Allen*, 469 F.3d 11(1st Cir. 2006) (upholding search of vehicle that had been "swerving, speeding, and signaling inconsistently" even though there was cocaine in the car); *United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (discussing the search of a car that was pulled over for speeding even though driver had no valid driver's license and was in possession of 53 grams of crack cocaine).

Even if it is unreasonable to believe that the Defendant would speed knowing he might be followed by the police, Detective Smith was not following the Defendant the entire time. She lost track of him early on when she was trying to follow him. The Defendant may not have immediately realized he was being followed again once Detective Smith caught up with him a second time. After she paced his car, she abandoned the pursuit, and Detective Engelman took over. Again, the Defendant may not have been aware in time that Detective Engelman was training his radar on the Defendant's car. The Defendant's argument that it is unreasonable to believe that he was speeding because it would have been counterproductive for him to do so is

13

unpersuasive, and it does not undermine Detective Smith's and Detective Engelman's testimony.

The Defendant discounts the notion that the he may have been acting irrationally as "pure speculation." (Def. Reply Br. 3, DE 33). He is correct that this is speculation, but it is speculation he has invited. The Defendant argues that "[i]t defies credibility to think that Moore, upon leaving a drug house and carrying crack cocaine, would drive at a rate of speed 20 miles an hour over the speed limit. Especially, knowing all along that he was an unlicensed driver and he believed he was being followed by a 'narc.'" (Def. Br. in Supp. of Mot. to Suppress 6, DE 29.) The Defendant even goes so far as to say such a belief is "absurd." (Def. Reply Br. 2, DE 33.) Speculating that the Defendant may have been acting irrationally is a proper means of rebutting the notion that it defies credibility or is absurd to believe that the Defendant acted as the government has alleged.

The Defendant's next argument is that Detective Engelman's testimony was inconsistent. The purported inconsistencies are all either nonexistent or inconsequential. The Defendant first claims that Detective Engelman realized who the Defendant was immediately when the detective saw him, rather than after a few moments as the detective testified. Assuming *arguendo* that Detective Engelman did recognize the Defendant sooner, this is of such little consequence that it does not undermine Detective Engelman's credibility.

Even if this purported inconsistency was crucial, the Defendant's explanation for why the detective must have recognized him immediately is weak. The Defendant claims Detective Engelman must have known his identity immediately because he arrested the Defendant on a

drug charge that became a federal case almost exactly three years earlier.[12] What the Defendant does not explain, and the Court is unable to understand, is how that conclusion follows from that premise. It is quite reasonable to expect that Detective Engelman may not recall the Defendant's name immediately, given the numerous arrests he has been involved in over those three years. The Defendant's argument that his partner must have told Detective Engelman who the Defendant was as they approached the car does not fare any better. Since Detective Engelman's partner recently arrested the Defendant it would make it unsurprising if he commented on the Defendant's identity, but it by no means makes it more likely than not that he did. Detective Engelman's testimony on this point is credible.

Next, the Defendant argues that Detective Engelman could not reasonably have believed that he smelled burnt marijuana since no burnt marijuana was found in the car. There are two problems with this argument. First, it is certainly possible for an officer to reasonably believe that he smells burnt marijuana when no burnt marijuana is recovered, either because the marijuana is discarded or because there is no burnt marijuana in the first place. To suggest otherwise is to conflate a reasonable belief and a perfectly accurate one. *See United States v. Dowthard*, 500 F.3d 567, 570 (7th Cir. 2007) (If an officer makes a mistake of fact, a court only asks "whether the mistake was 'reasonable' in order to determine if there was probable cause."). Second, Detective Engelman's testimony was that he smelled marijuana, not necessarily that he

---

[12] The case that the Defendant refers to is *United States of America v. Moore*, 1:04-CR-16-TS. This Court dismissed that case on the government's motion. (DE 30.) Because the government does not contradict the Defendant's claim that Detective Engelman did in fact arrest the Defendant in that case, the Court assumes that the claim is accurate, although the Defendant does not point to any particular place in the record establishing that fact, and the Court has not found any support for the claim in the record.

15

smelled *burnt* marijuana.[13] Marijuana was recovered from the car. There is no inconsistency in this line of testimony.

The Defendant also argues that Detective Engelman contradicted himself by stating that he actually clocked the Defendant going 65 miles per hour. The problem with this argument is that there was no such testimony. The page in the transcript to which the Defendant cites does include a reference to the speed of 65 miles per hour, but it is a reference to the speed *limit*. It does not, however, contain any statement by Detective Engelman that he clocked the Defendant driving 65 miles per hour. As the Defendant is aware, Detective Engelman did testify that he clocked the Defendant going 85 miles per hour. (Def. Br. in Supp. of Mot. to Suppress 3, DE 29) ("Detective Engelman claims that using his moving radar system, he clocked the vehicle at 85 miles per hour.") Detective Engelman's eleven explicit references (Tr. 8, 10, 26, 28, 34, 43, & 46) to the 85 miles per hour speed are consistent with Detective Smith's four references (Tr. 58, 70, & 71) to the same speed. The testimony with regard to the Defendant's speed is entirely consistent throughout the testimony of the government's witnesses.

The Defendant contends that although Detective Engelman testified that he observed movement in the car as he approached, the video from the in-car camera shows otherwise. It does not. The video shows that the Defendant was in fact moving in the car. This is consistent with the Defendant's own testimony that he was looking for his identification. Of course, the video cannot exactly reflect what Detective Engelman was observing, as imperfect lighting on

---

[13]   "Q.   [W]as there anything else that you perceived to be unusual?
       A.   We smelled a strong odor of marijuana coming from inside the car." (Tr. 14.)

       "Q.   Now, the marijuana – but you said, when reviewing the video, that the marijuana you smelled I believe the words you used were burning marijuana; is that correct?
       A.   I don't recall using that." (Tr. 37.)

the video necessarily obscures to some degree what Detective Engelman may have been able to see in the car. There is no inconsistency here either.

The next purported discrepancy is that Detective Engelman testified that the in-car video automatically turns on when the light bar is activated, and in this case when the camera came on the Defendant had applied his brakes and was beginning to stop. It is not clear if there was a slight delay in the tape or if the Defendant had begun slowing down before the lights were activated. The Court is unable to see how this makes any difference.

Similar to his argument that he could not have been speeding because that would not have been wise, the Defendant asserts that "[if he] was driving 85 miles per hour and carrying crack cocaine on his person and did not have a valid driver's license, then certainly, when police activated their overhead lights he would have attempted to evade the police by further accelerating." (Def. Br. in Supp. of Mot. to Suppress 8, DE 29). The logical conclusion of this argument is that only innocent people pull over when the police activate their lights, and everyone guilty of traffic violations or other crimes speed off. In reality, this of course is not the typical practice. The Court is also unwilling to assume that the Defendant would necessarily compound his troubles by instigating a high speed chase.

Finally, the Defendant takes issue with the fact that Detective Engelman neglected to wear his microphone when he conducted the traffic stop. It would have been slightly more helpful if he had worn the microphone, but that is not fatal to the government's case. The failure to wear a microphone during a traffic stop does not itself undermine the credibility of the detective's testimony.

**CONCLUSION**

The testimony of Detectives Engelman and Smith strongly corroborate each other. The Court finds that the credibility of their testimony outweighs that of the Defendant's, particularly in light of the Defendant's criminal record, the Defendant's obvious incentive to shade the truth, and the lack of any such incentive on the part of the detectives. The Defendant was speeding on Interstate 469 while being followed by Detectives Engelman and Smith. Detective Engelman therefore had probable cause to initiate the traffic stop. Because Detective Engelman smelled marijuana, he had probable cause to search the vehicle without a warrant. The Defendant was driving without a license and his arrest for this violation was proper. As such, the officers were entitled to search the Defendant's person and vehicle, both as a search incident to arrest and as an inventory search consistent with established police policy. The recovery of the contraband was consistent with the requirements of the Fourth Amendment, and the evidence is therefore not subject to suppression.

**ORDER**

For the reasons stated in this opinion, the Defendant's Motion to Suppress (DE 19) is DENIED. The Defendant's objection to the government's request to admit a certified copy of a reckless homicide conviction is SUSTAINED.[14] This matter is now set for a telephonic scheduling conference on February 12, 2008, at 11:00 a.m. to set the final pretrial conference and jury trial dates. The Court will initiate the call.

---

[14] The Court invited the parties to brief the admissibility of the exhibit, but both parties declined the invitation. The Defendant admitted that he had been convicted of reckless homicide. (Tr. 97.) There was no objection to this testimony, and the Court has relied on the testimony to establish the prior conviction. The additional proffered evidence establishing the conviction is therefore unnecessarily cumulative. Fed. R. Evid. 403.

SO ORDERED on February 7, 2008.

                                           s/ Theresa L. Springmann
                                          THERESA L. SPRINGMANN
                                          UNITED STATES DISTRICT COURT